## Chicago & E. I. R. R. Co. v. Florence Myers, Adm'x.

1. FELLOW-SERVANTS—*Negligence—Proofs Necessary to a Recovery.*
—To entitle a recovery for an injury resulting from the negligence of a fellow-servant, the plaintiff must prove that the servant was incompetent and that his master employed him, or retained him in his employ, either with actual knowledge that he was incompetent, or under such circumstances that he is legally chargeable with such knowledge, and that the injury is the result of the servant's negligence.

2. MASTER AND SERVANT—*Presumptions as to the Selection of Servants.*—The presumption is that the master exercised proper care in the selection of his servants.

3. PRESUMPTIONS—*From a State of Facts Shown to Have Existed.*—A state of facts once shown to exist is presumed to continue until the contrary is made to appear.

4. SAME—*Where the Master in the First Instance Exercises Proper Care in the Selection of Servants.*—The master having in the first instance exercised proper care in the selection of servants, and such servants, at the time of their employment, having been suitable for the business, these qualifications are presumed to continue until either he has actual notice of a change in the servants' qualifications, or is shown to have knowledge of such facts as are equivalent to notice, and would put a reasonably prudent man on his guard.

5. EVIDENCE—*Of Incompetent Servants.*—A single act or omission is not sufficient to prove incompetence of an employe, but it may, under some circumstances, show him to be an improper and unfit person for a position of trust, or any particular service; as, when an act is done wantonly, regardless of consequences, or maliciously, it may be such as to furnish an unerring index of the character of the employe, and when considered by itself or in connection with the circumstances surrounding it, be sufficient to demonstrate his unfitness to be placed in any position requiring great or even ordinary care in the discharge of its duties.

6. EMPLOYES—*Single Acts of Forgetfulness.*—An individual who by

years of faithful service has shown himself trustworthy, vigilant and competent, is not proved either incompetent, careless or untrustworthy by a single mistake or act of forgetfulness, or omission to exercise the highest degree of caution and presence of mind.

**Action in Case.**—Death from alleged negligence. Trial in the Superior Court of Cook County; the Hon. FARLIN Q. BALL, Judge, presiding. Verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the October term, 1898. Reversed and remanded. Opinion filed June 29, 1899.

WILL H. LYFORD, J. B. MANN and ALBERT M. CROSS, attorneys for appellant.

Proof of one act of negligence does not even tend to prove incompetency of a servant. Holland v. S. P. Ry., 100 Cal. 240; Dysart v. K. C., Ft. S. & M. Ry. (Mo.), 46 S. W. Rep. 750; Baulec v. N. Y. & H. R. Ry., 59 N. Y. 356; Baltimore E. Co. v. Neal, 65 Md. 438; Cosgrove v. Pittman (Cal.), 37 Pac. Rep. 232; Wharton on Negligence, Sec. 238; McKenney on Fellow-servants, Sec. 91, p. 203; Western Stone Co. v. Whalen, 151 Ill. 472.

MUNSON T. CASE, attorney for appellee.

" The degree of care to be exercised by a master in the selection of servants  *  *  *  is such as is reasonable and proper in view of the nature and character of the business and the consequences likely to result from a negligent or unskillful execution of the work." Wood on Master and Servant, Sec. 418.

MR. JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from a judgment for $1,600 against appellant in favor of appellee, for alleged negligence causing the death of appellee's intestate, John B. Myers. The declaration contained five counts, four of which were eliminated from the consideration of the jury by instructions, leaving only the second count, which, as amended, is substantially as follows :

Deceased in his lifetime was in the employ of the defendant as a brakeman upon a certain freight train, being moved in a northerly direction, between the stations Cayuga and

C. & E. I. R. R. Co. v. Myers.

Perrysville, and it was the defendant's duty to exercise ordinary and reasonable care in the selection of its servants, both engine men and trainmen, on said freight train, and also its passenger trains, which defendant was operating over said road, with whom it might become necessary for deceased to work in the movement of said freight train. Yet, defendant, disregarding its duty to deceased, carelessly and negligently employed, as engineer of one of said passenger trains being moved in a northerly direction behind said freight train between said stations, a careless, incompetent and unskilled servant, when defendant knew, or by the exercise of reasonable care should have known, said servant was careless, unskilled and incompetent, *and the defendant negligently retained said servant, to-wit, said engineer, in its employ, after it knew that said servant was careless, incompetent and unskilled;* that thereby deceased, while exercising ordinary care for his own safety, and while performing his duties as said brakeman on said freight train, which had become stalled upon defendant's road, and which was being moved or attempted to be moved by the freight engine thereto attached and the passenger engine of said passenger train, upon which said careless, incompetent and unskilled servant was employed as engineer (deceased), was, by reason of the lack of skill and incompetency and carelessness on the part of said engineer in performing his duties, and in the negligent and careless application of the air brake on said passenger engine, which caused the breaking of the coupling of said engine, thrown with great force and violence from a certain gondola car, one of the cars being pushed by said passenger engine, to and upon the ground, and upon, to wit, a certain side track of defendant's railroad, his leg and body being run over by the wheels of said car, and he sustained mortal injuries, from the result of which he shortly thereafter died.

The part of the count italicized was added as an amendment after the evidence was all in, and after counsel for plaintiff had addressed the jury and counsel for the defendant had proceeded with his argument for some time.

Appellant pleaded the general issue and the statute of limitations to the count as amended. The suit was commenced November 14, 1895, and the trial occurred in February, 1898. The court sustained a demurrer to the plea of the statute. Appellee's intestate was a brakeman on a freight train of appellant consisting of an engine, thirty-three cars loaded with coal and a caboose. September 25, 1894, between twelve and one o'clock A. M., near a station called Dickason, in Vermilion county, in the State of Indiana, while ascending a considerable grade on the main track in a northerly direction, for the purpose of taking a side track to allow a passenger train which was following the freight train to pass, the freight train came to a dead stop, which was necessary in order to have a brakeman run ahead and turn the switch into the siding. When the switch was turned an attempt was made to start the train, which was unsuccessful, by reason of the fact that the rails were so wet and slippery that the wheels of the engine merely spun around on them in one place without moving forward. Rutherford, the conductor of the freight train, then sent Myers back to flag the approaching passenger train, which he did, and when that train came up Rutherford requested Burley, the engineer of that train, to couple on to the rear of the freight train and help to move it up the grade and into the siding.

The passenger train consisted of an engine, a baggage car, two coaches and a sleeper. Myers coupled the engine of the passenger train to the rear of the freight train, using for that purpose the pilot bar of the engine. The engine was not detached from the cars which it was moving. Both engines were then started and after the freight train had been moved by them from 500 to 700 feet, Rutherford, the conductor of the freight train, thinking that the engine of his train could complete the work, pulled the pin out of the pilot bar and the passenger train stopped. The consequence of disconnecting the passenger engine from the freight train was that the slack between the freight cars, which the passenger engine had been pushing, ran out, the cars

ran downward and backward, and the freight train was broken in two sections. The rear section, consisting of five cars and the caboose, remained on the main track, and the forward section was pulled into the siding by the freight engine. Rutherford then requested Burley to hitch on to the rear section of the freight train and push it into the siding. Burley coupled on as requested; Myers went to the front platform of the forward car of the section, which was a gondola car, with a platform about six inches wide, and stood on the east side of the platform. Rutherford went to and stood on the east steps of the platform of the caboose. Burley then started his engine, and after the cars had moved about 500 feet, at a speed of about five miles per hour, Rutherford received a signal from Myers which he understood to be a " go slow " signal, and says he passed it back to Burley. Either some other signal was given, or Burley mistook the one given, and applied about ten pounds air pressure to the brakes, when the passenger engine and cars stopped short. The effect of the sudden stoppage of the passenger engine, coupled with the momentum of the freight cars, was to break the eye of the pilot bar connecting the engine and caboose, and cause a jerking of the freight cars. At the time this jerking occurred Rutherford says that he saw Myers' lantern go over, and immediately went forward and found Myers lying on the west side of the track, about the length of two rails from the switch, with his leg off. He died shortly afterward as a result of his injuries.

To entitle appellee to recover, it was incumbent on her to prove that Burley, the engineer of the passenger train, was an incompetent engineer; that appellant employed him, or retained him in its employ, either with actual knowledge that he was incompetent, or under such circumstances that appellant is legally chargeable with such knowledge, and also that the injury to appellee's intestate was caused by his negligence. Our view of the case, after careful consideration of the evidence, is such that we do not deem it necessary to pass on the question whether Burley was guilty of

negligence at the time of the accident.    There is no evidence of Burley's incompetency prior to the time of his employment by appellant.    John McClure, a locomotive engineer of twenty-seven years standing, testified that he and Burley were born and brought up in the same town; that Burley became a railroad engineer in 1871, and operated an engine on the Pennsylvania Railroad until the fall of 1882, and on the Wabash Railroad from the latter time until July 4, 1894, at which last time he, the witness, saw and rode with him.    Rutherford testified that he was employed by appellant about the latter part of August or first of September, 1894, but is not certain whether Burley was employed by appellant before he was or not.    If he worked for the Wabash road until July 4, 1894, he must have been employed by appellant shortly after that date, because the evidence shows that he had been in appellant's employ some time prior to September 25, 1894, when the accident occurred. He had, therefore, been engaged as a railroad engineer about twenty-three years when he was employed by appellant. This fact of itself is *prima facie* evidence that Burley was a competent engineer when employed by appellant.    But such proof, on the part of appellant, is not required, the presumption being, in the absence of evidence to the contrary, that appellant exercised proper care in employing the engineer.

In Baulec v. N. Y. & Harlem R. Co., 59 N. Y. 356, a leading case which is relied on by counsel for both the parties in the present case, the court say :

"There is no impeachment or attempt to impeach the qualification of McGerty as a switchman, except by the proof of a single occurrence several months before the occurrence in question.    It is not contended that the defendant was wanting in the exercise of due care in his original employment, and it must be assumed that he was competent when employed and reasonably intelligent, and was, during all the time he was in the service of the defendant, sober, temperate, attentive to his duties, carefully, intelligently and successfully performing the services required of him, with the single exception referred to."    " The presumption is that the master has exercised proper care in the selection

of the servant." Bailey's Master's Liability for Injury to Servant, 55. See also Davis v. Railroad Co., 20 Mich. 122.

And "the master having in the first instance exercised proper care in the selection of servants, and such servants, at the time of their employment, having been suitable for the business, these qualifications are presumed to continue until either he has actual notice of a change in the servant's qualifications, or is shown to have knowledge of such facts as are equivalent to notice, and would put a reasonably prudent man on his guard." Wood on Master and Servant, Sec. 431.

"A state of facts once shown to exist is presumed to continue until the contrary is made to appear." W. Stone Co. v. Whalen, 151 Ill. 482.

Appellee relies only on a single occurrence as evidence that Burley was incompetent. Rutherford, the conductor of the freight train at the time when the accident in question occurred, testified that while operating a freight train he had occasion to pass and repass a passenger train which was hauled by Burley; that there never was any difficulty in the passing of the trains except once; that the difficulty referred to was reported to and investigated by Mr. Corwin, appellant's superintendent, at Danville; that witness said to Mr. Corwin, in Burley's presence, that the flag was out the proper distance; that the engineer passed right by the flagman and did not pick him up, and that there was a torpedo down, which exploded, which the witness heard, and which means stop on the track immediately. The witness, in his examination in chief, said that this was all he knew of; that what Corwin or Burley said on the occasion referred to, he would not be positive of, and would not like to say; that he, the witness, after reporting to Corwin, as above stated, excused himself and left; that the report was made to Corwin about a week or ten days before the accident in question. The time when the alleged difficulty, which the witness says he reported to Corwin, occurred, does not appear.

On cross-examination the witness testified as follows:

"I said to Mr. Corwin, 'Did he allow his engineers to run by flags and not pick them up, as directed by the

rules?' He said, 'No, sir.' I told him about this case. I
told him that Mr. Burley run by a flag at Hillsdale. I
told him it was very foggy, and that it was necessary for
him to run his train through the side track—the passenger
train; that I stood on the main track with my train broken
in two parts. I had been switching there, and I had plenty
of time to get out of the way, but in starting to pull out and
back in, I pulled out a pin, and I sent the flagman back.
That is what I told Corwin, and told my brakeman to run
him through the side track and pull the other switch open;
that is, the second switch, open for him, and he did so, and
Burley ran onto the side track all right."

Q. "And your complaint was that he did not stop and
pick up the flagman?" A. "That is my complaint
exactly."

Corwin, appellant's superintendent, testified that he had
no recollection of any such complaint as that testified to
by Rutherford; that ordinarily he would not recollect such
a complaint.

Burley, at the time of the trial, was in the employ of a
railroad company in Mexico, his headquarters being at San
Luis. The record shows that he was sick, and for that
reason appellant could not procure his attendance as a
witness.

Appellee introduced in evidence certain rules, some of
which are as follows:

Rule 30. "An explosive cap or torpedo, placed on the
top of the rail, is a signal to be used in addition to the
regular signals. The explosion of one torpedo is a signal
to stop immediately."

Rule 86A. "All trains must use every exertion to pass
quickly as possible, and passenger trains will take siding,
when by so doing time can be saved, but when practicable
freight trains must take siding, and be clear of main track
at least five minutes before passenger train is due; and
when necessary to keep main track, the conductor of the
freight train must flag the passenger train, as per rule 99,
and have switch thrown for them to take siding, which
must be cleared the length of passenger train."

Rule 99. "When a train is stopped by an accident or
obstruction, the flagman must immediately go back with
danger signals, to stop any train moving in the same direc-
tion; at a point fifteen telegraph poles from the rear of his

train, he must place one torpedo on the rail.  He must then continue to go back at least twenty telegraph poles from the rear of his train, and place two torpedoes on the rail ten yards apart (one rail length), when he may return to a point fifteen telegraph poles from the rear of his train, and he must remain there until recalled by the whistle of his engine.  But if a passenger train is due within ten minutes, he must remain until it arrives.  When he comes in, he will remove the torpedo nearest the train; but the two torpedoes must be left on the rail as a caution signal to any following train."

Rule 675.  Engine Men.—"They must obey all signals given, even if they think such signals are unnecessary. When in doubt as to the meaning of a signal, they must stop and ascertain the cause, and if a wrong signal is shown they must report the fact to their conductor."

Analyzing the evidence of Rutherford, in connection with the rules, it shows the following situation :  The passenger train of which Burley was engineer was about due; the freight train of which Rutherford was the conductor, was on the main track, but should then, under rule 86A, have been run onto the side track, if practicable; but this was not practicable, because, as Rutherford says, it had been broken into two sections because of his pulling a pin which it is apparent he should not have pulled.  Under these circumstances he sent his brakeman back to pull open the other or second switch of the siding, which was farthest from the freight train and nearest to the incoming passenger train so that the passenger train could be run on to the siding.  This the brakeman did.  Under the circumstances, it was Burley's duty, under rule 86A, to take the side track; the rule in this regard being, " All trains must use every exertion to pass quickly as possible, and passenger trains will take siding when by so doing time can be saved."

Rutherford's train being on the main track, and it being impracticable for him to run it on to the siding, for the reason stated by him, his duty, as prescribed by rule 86A, was as follows :

" When necessary to keep main track, the conductor of

the freight train must flag the passenger train, as per rule 99, and have switch thrown for them to take the siding, which must be cleared the length of the passenger train."

It must be presumed that Rutherford did his duty, and that the siding was clear the length of the passenger train. It may be legitimately inferred from the evidence that the siding was entirely unoccupied. What the flagman said to the engineer, Burley, if anything, does not appear. Appellee's counsel argues that the supposition that the brakeman said anything to Burley is negatived by the fact that Burley did not take him on his train, but it is obvious that he might have spoken to Burley without being "picked up" by the latter. Neither does it appear whether the main track was or not straight between and extending beyond the switches of the siding in each direction, or how far the switch by which Burley took the siding was from the place where the freight train was on the main track. The brakeman may have told Burley to take the main track. Rutherford says he told the brakeman to run him, Burley, through the side track. There can be no presumption that the brakeman disobeyed this direction. Burley may have seen the freight train on the main track, and must have known, either by sight, or by being told by the brakeman, that the switch onto the siding was open, because otherwise he certainly would not have taken the switch, which he did, and, as Rutherford says, ran onto the side track all right.

Burley may have been guilty of a technical violation of rules 30 and 675, *supra*, in not stopping his train immediately on the explosion of the torpedo, but it is doubtful at least, whether, in this omission, he was guilty of any substantial violation of appellant's rules. The rules must be construed together, and rule 86a provides, "All trains must use every exertion to pass quickly as possible, when by so doing time can be saved."

Rutherford's testimony that his exact complaint was that Burley did not stop and pick up the flagman, meaning the brakeman sent to flag the train, is significant. None of

the rules in the record makes it the duty of the engineer to "pick up" a flagman under the circumstances disclosed by the evidence. The general rule, subject to an exception hereinafter noted, is that a single act or omission is not sufficient to prove incompetence. Wood on Master and Servant, Sec. 432; 1 Bailey's Pers. Injuries, etc., Sec. 1511; Wharton on Negligence, 238; Lee v. Detroit B. & I. Works, 62 Mo. 565; Holland v. S. Pac. Co., 100 Cal. 240; Baltimore El. Co. v. Neal, 65 Md. 438, 454; Baulec v. N. Y. & H. R. Co., 59 N. Y. 356.

In Holland v. S. Pac. Co., *supra*, the prior act of negligence relied on was that the engineer ran a train twelve to fourteen miles in forty minutes on a part of the road not safe for fast running, the schedule time being sixty minutes.

In the Baulec case, *supra*, the act relied on as evidence of incompetency was that the switchman changed the signal so that it indicated that the switch was right for the Harlem road, without changing the switch correspondingly, by reason of which a train was derailed.

In each case it was held, as matter of law, that the act was insufficient to prove incompetency.

The exception to the general rule is thus stated in Baulec v. N. Y. & H. R. Co.:

"A single act may, under some circumstances, show an individual to be an improper and unfit person for a position of trust, or any particular service, as when such act is done wantonly, regardless of consequences, or maliciously." P. 363.

In Holland v. S. Pac. Co., *supra*, the court say:

"It may be and doubtless is true, that a single act may be such as to furnish an unerring index of the character of the actor, and when considered by itself or in connection with the circumstances surrounding it, be sufficient to demonstrate the unfitness of a person to be placed in any position requiring great or even ordinary care in the discharge of its duties." P. 244.

Other authorities are to the same effect. We are of opinion that the omission of Burley testified to by Rutherford is not an exception to the general rule, and is insuffi-

cient as proof of incompetency. It is to be borne in mind that negligence and incompetence are not convertible terms. One thoroughly competent may be negligent (Bailey's Pers. Inj., etc., Sec. 1509); and while a series of acts of negligence, or even a single act, may so indicate the character and mental disposition as to prove incompetency, a well qualified and entirely competent person may be negligent on occasion, without being obnoxious to the charge of incompetency.

It was incumbent on the appellee to prove an act or acts of Burley of such character that the law would impose on appellant the duty of discharging him from its service. Appellant's superintendent investigated the complaint made by Rutherford, and declined, properly, as we think, to discharge him. The law on this subject is clearly stated in Baulec v. Railroad Co., *supra*, the court saying :

" If it be conceded that the negligence of McGerty upon the prior occasion is established, it by no means follows that the defendant was bound to discharge him upon peril of being charged with neglect and a want of due care in retaining him in its service. An individual who by years of faithful service has shown himself trustworthy, vigilant and competent, is not disqualified for further employment, and proved either incompetent or careless, and not trustworthy, by a single mistake or act of forgetfulness and omission to exercise the highest degree of caution and presence of mind. The fact would only show what must be true of every human being, that the individual was capable of an act of negligence, forgetfulness or error of judgment. This must be the case as to all employes of corporations until a race of servants can be found free from the defects and infirmities of humanity."

But even though it should be conceded that the testimony of Rutherford tended to show incompetency, we are of opinion that the preponderance of the evidence is against the proposition that Burley was incompetent. McClure, the locomotive engineer, who had known Burley from boyhood, testified that Burley worked under him from December, 1866, till July 1, 1894; that Burley's reputation for care and skill as a railroad man was good; that he, the witness,

had ridden with him on his engine at least fifty times. Levi Nead, general foreman of the machinist department of the Wabash Railroad, testified that Burley was running under him from July 1, 1885, until July 1, 1894, and that his reputation for carefulness and skill was first class in every respect. Louis Velot, a locomotive engineer, testified that he knew Burley very well while he was on the Wabash road; that Burley was on the opposite run from him, and that he saw him every day for nearly six months; that he knew his reputation for carefulness, that it was good, and that he was a good engineer. · In the examination of the witness Finn, he was asked whether the application by Burley of ten pounds of air to the brakes, about the time Rutherford testified he signaled Burley to go slow, was proper. The question was improper. The witness is an expert, and the question might have been asked him, what the probable effect of such application of air would be, under the circumstances in evidence, but whether the act of applying it was proper, was a question for the jury. Chicago v. McGiven, 78 Ill. 347.

We are of opinion that the court did not err in sustaining the demurrer to appellant's plea of the statute of limitations. We find no reversible error in any other rulings of the court objected to in the argument of appellant's counsel.

The judgment will be reversed and the cause remanded.